Good morning, Your Honor, and may it please the Court. I'm Jonathan Rubin of Mogan Rubin, LLP, appearing on behalf of Appellants Med Vets, Inc. and Bay Medical Solutions, Inc. I'd request to reserve three minutes of my time for rebuttal. Okay, well, keep track of your time. We'll try to remind you. Thank you, Your Honor. The first amended complaint in this case, which we refer to as the FAC, was dismissed with prejudice last year by the District Court's order granting defendants motion to dismiss. And we're here to ask the Court to review the FAC de novo and to hold that the three claims stated therein, unlawful merger in violation of Clayton Act, Section 7, and monopolization and attempted monopolization in violation of Sherman Act, Section 2, are sufficiently pleaded. The District Court, of course, did not see it this way, not because the facts alleged in the FAC, if true, were not sufficient to state a claim entitling plaintiffs to relief, but because the facts alleged in the FAC, according to the District Court, could not possibly be true. Now, there's no dispute in this record or in this case over the applicable legal standards as far as they go, either for civil pleading in general or for pleading a relevant antitrust product market in particular. The District Court and both parties recognize that Twombly and Iqbal do not require a court to accept as true allegations that are not plausible on their face or are no more than speculation or legal conclusions couched as factual allegations. The District Court and the parties all cite the Newcal and Hicks cases as the controlling authority on pleading market definition in this circuit, and we agree, for example, with Newcal that a complaint may be dismissed if the relevant market definition is facially unsustainable, for example, because it's based on constraints imposed by voluntary contractual arrangements rather than market realities and the interchangeability of available alternatives. We also agree that a relevant market definition that depends on implausible assumptions is facially unsustainable, as in Hicks, where functional and economic substitutes were eliminated from the defined market arbitrarily, implausibly eliminating competing modes of advertising and contriving an artificial market in which the defendant was a monopolist. Counsel, on that point, the District Court faulted you for excluding both veterinarians and manufacturers from the market. And starting with veterinarians, you've alleged that defendant VIP, which operates veterinary clinics, competed in the market by distributing unmeasured medications to non-veterinary retailers. So why, if they're based on your own allegations, why shouldn't veterinarians be included within the market definition? Your Honor, the simple answer is that because one or some veterinarians choose to enter into a sideline, essentially becoming a diverter or a distributor of these restricted products does not mean that all veterinarians can do it. There are veterinarians that have only a few vets in their practice. Generally, OEMs, manufacturers of these products, allot product quantities according to the number of veterinarians in the practice. That's what gives VIP, with something like 14,000 veterinarians, tremendous buying power from manufacturers and the capacity to enter into this market. Now, the ordinary veterinarian is not going to do this, nor are they going to be in a position to service the large national retailers that diverters generally serve. Counsel, you don't have an allegation in the complaint that VIP was the only veterinarian in a position to be able to do this. Is that correct? That is correct, Your Honor. We cite in our complaint the number of participants in this secondary distribution market, as the FTC called it in their report. We cited the ones we know. VIP was one. We are another. And there are a few more that we know of, and there may be others that we don't know of. But what we do know is that there is a difference between functional interchangeability and economic interchangeability. Yes, theoretically, any veterinarian can sell product that they purchase from animal health manufacturers to a large retailer. Economically, are they in a position to do that, or is a Costco or a Walmart in a position to shop around with veterinarians or enter into agreements with veterinarians in order to get a small amount or some quantity of product? Probably not. Veterinarians, unless they are dedicated or at least have a dedicated department to this type of distribution, are not in a position to compete. Can I ask you a simpler question, going back a step? I wasn't entirely clear from your brief and complaint whether this is a horizontal merger case, a vertical merger case, or both. There are really four markets that we're talking about. There's the manufacturer to the vet or pharmacy. There's the vet or pharmacy to the diverter. There's the diverter to the non-vet retailer, and the non-vet retailer to the consumer. Now, VIP, I know, was in the second of those markets. It was a vet that gave products to diverters. Was it also a diverter? It was also a diverter. It itself directly distributed goods to non-vet retailers? To both, to non-vet retailers and to other diverters. And your question about horizontal or vertical, the answer to that is both as well. I would say primarily it is a vertical merger because the distributor, Pet IQ, has the relationships with the ordinary, unrestricted, measured pet products with the retailers. And VIP is a veterinary chain with thousands of mobile clinics and thousands of brick-and-mortar clinics, and their primary business is veterinary services and the diverting of large quantities of product that they're allotted by manufacturers. That does not mean that there was also business. VIP was a supplier to our clients prior to the merger. VIP was a supplier, as far as we understand, to some retailers prior to the merger. And VIP's buying power has now been captured by Pet IQ, which, of course, has got, and they will show you in their materials, an extremely broad relationship with almost every major national retailer. And so they are in a position to offer the tremendous quantities of restricted products that VIP can purchase from manufacturers to these retailers, so much so that they themselves claim to have 95% of the market for prescription veterinary products at retail. So let me follow up on the point you just made. So normally when you see a vertical merger complaint, you see a description of the top market. I don't know what antitrust lawyers call this, but the upstream market. Here are the vets to the diverters, and you see a description of the second market, the diverters to the non-vet retailers. So you see things like the complaint identifies who the major players are and what their percentage of the market is, what the concentration of the market is. So I just wanted to give you some sense of what this looks like. The concern I have about your complaint is when I was done reading it, I just don't have any idea what either of those two markets looks like, except I know that MedVet, I'm sorry, that VIP was a big national chain of vets. I don't know whether it's one of 10, one of two, one of one, one of 100, I don't have any sense of that, or what kind of market concentration there is in that top market. And with respect to the secondary market, you do allege that they have 95% of the pharmaceutical products. But there's no allegation, your brief says that pharmaceutical products are the principal segment of that second market, but it doesn't tell me what that means. What, am I missing something in your complaint that would give me some sense of who the market participants are and what their concentrations are in those two markets? Sure, your honor. I think that the structure that you built with the levels of distribution where there is a vet between the manufacturer and a diverter is not strictly accurate. That's not to say that that structure cannot arise. A diverter is generally a veterinarian practice with access to large quantities of product, and it diverts the product. Whether it diverts it to another diverter or to a distributor directly to a retailer, we don't feel that that matters all that much. We have pleaded in the complaint the entities that we know of that are fulfilling this role. So there are a few suppliers and entities with pharmaceutical licenses that specialize in this, and there are a few- And layer three is diverter to non-vet retailers, and layer four being non-vet retailers to consumers. Who's in that second layer of vets who can get restricted products from manufacturers, but then who push those products on down the market, other than VIP? Who does your complaint identify? Well, we identify in paragraph 37 of the FAC three or four companies, Southeastern Veterinary Exports, Lambert Vet Supply, Rainbow Vet Supply, Pet Vet Supplies. These are diverters that we know of. Are they people who get the stuff directly from the manufacturer? They can. But they're not vets. They are folks with veterinary credentials that are able to purchase from manufacturers. In order for the manufacturers to represent, we sell only to vets or vet pharmacies. So the key idea here is that there are a small group of companies that have the veterinary credential, and they purchase the products generally from the manufacturers who sell it to them because they are able then to tell their veterinarians, we sell only to vets. But you have excluded manufacturers from your definition of the relevant market, and now you're telling me that they play a big role in the relevant market. Well, they are the suppliers and manufacturers. They are not alternatives for a retailer to go to in order to get its supply. So the group of products itself have two characteristics. They are restricted in some way, either like Frontline Plus because the manufacturer has adopted a policy to restrict it, or they're restricted because they are pharmaceutical products that require a prescription. And the second attribute that they have is that they are repeated products for chronic preventative use, not acute. So therefore, there will be a large consumer demand large enough so that a retail box chain store will want to carry the product. Now, these products must be sold to some sort of credentialed veterinary entity that can be a veterinary pharmacy or someone with a veterinary pharmacy license or a veterinary practice. There are a few of these companies. We fully admit that we have not had discovery yet. We don't know the identity of all of them. We know a few of them because my clients have been in this business for more than 10 years. And that is the funnel, if you will, through which these restricted products must flow to retailers. Counselor, you're down to about a minute and a half if you wanted to. The last point I would make then, and thank you for the reminder, Your Honor, is that the question of market definition has to do with the choices confronting the end consumer, which, as the court indicated in its footnote, and accepted, we are talking about retailers. So this is a wholesale market. Can a retailer call a manufacturer and say, send me X quantities for the Western state stores that I have? You know, they won't do that. The manufacturers are not an alternative for retailers. That's why they are not in the market. Retailers only have diverters, and soon they will only have VIP. And with that, I'll retain the remaining one minute and thank you for your attention. Thank you. May it please the court. May it please the court. Thank you for the opportunity to speak with you today and during these challenging times. And thank you for all of the staff from the court and beyond that are helping with our virtual technology today to make this connection possible. I intend to address the issue of market definition and market power where my co-counsel, Ms. Jennifer Persigian, will be addressing the issue of MedVet's flawed efforts to obtain pre-complaint discovery. Your Honor, Judge Chesney got it right in this case. She dismissed MedVet's complaint with prejudice after it failed to demonstrate any ability to plead a plausible relevant market or a market power within any relevant market after no less than four attempts to do so. MedVet's claims under Section 7 and Section 2 both require one, plausible market definition, and two, a factual pleading of market power. MedVet's failed to sufficiently plead either in this case. We agree with plaintiffs largely on the law, which is a great thing about this case. We're not disputing the law. We agree that Twombly applies and NewCal applies, but the definitions and the lack of substantive pleading allegations in the complaint merit dismissal in this case. Mr. Rubin just stated that it is the customers and the consumers that are supposed to be defining this marketplace. That is absolutely contrary to the holding in NewCal, which states that consumers do not define the boundaries of the market. The products or the producers do. Your Honors have already discussed how this complaint and plaintiff's proposed market definition is flawed and facially unsustainable for multiple reasons. First, it's fundamental that the market definition must include all reasonable substitutes. Again, NewCal, we're reciting all the way back from Brown Shoe. But MedVet's market definition is too narrow, and in fact, as this court stated in Hicks v. PGA, is in fact not natural, artificial, and contorted to meet their litigation needs. That's exactly this case. MedVet has contrived a product market here to exclude all others in an attempt to try to create a false market of one. Our client or maybe some others that we heard about today without any, any factual pleadings of what the market structure looks like. Your Honor asked about a supply side demand or supply side or upward competition or downward competition supplier demand side. There's no factual pleadings. There's no allegations to give you or anybody else a reference of what this market looks like. We've talked about how plaintiffs have excluded at least two relevant market participants and important market participants. One, veterinary clinics, and two, manufacturers. It is nonsensical that the definition here excludes my client, VIP Pet Care, which is by definition a pet clinic and a veterinary clinic. But yet plaintiff's definition would exclude it. Now they say, and in reply, in an attempt to come back on this, say, well, MedVets is different. Pet IQ is different. And VIP Pet Care is different because they act differently. Unfortunately, that's not the law. Other clinics are competitors and therefore they are economic substitutes. MedVets tries to claim that although a vet clinic is different, it's because virtually all other lack the scale and systems. If my client was able to do it, if plaintiff was able to do it, there are certainly others out there that are able to do it. Plaintiffs reference multiple times the FTC report in order to back up their claim. You talk faster than I think, so I apologize for that. We are at a pleading stage here. We're applying Rule 8, not Rule 9. All that's required is plausibility. So the explanation for why your client is the only vet that's included in the market definition, not anybody else, is that your client is by far the biggest and it's sort of sui generis. And that's why it's in. And you just say that there's no explanation about the others. Well, they've pledged your client is essentially sui generis. Isn't that... They do plead reasons for excluding those people that they have excluded from the market. And at this point, all we need is a plausible explanation for their exclusion. Doesn't that meet the plausibility standard, at least? We certainly know, Your Honor. It may not be true, but true isn't what we're about here. Plausibility is what we're about here. Absolutely, Your Honor. We accept all the well-pled allegations as true. Certainly. And we certainly agree that we're at a pleading stage here. And discovery certainly may reveal more information. However, this court under Twombly, under Newcal, is not required to accept a complaint that is facially unsustainable. And that's what we have here. We have a complaint that is inconsistent, is vague, conflicts with itself in multiple places in order to plead them out of court. Because this court does not need to allow this to proceed into discovery, which we know under Twombly. Antitrust litigation is expensive, it's time-consuming, and it goes on for longer than it needs to. But that's the reason, as a gatekeeping measure, Twombly and others have instituted this, not just plausibility, but as this court has held facially unsustainable, where we have that evidence. And that's what the district court found here. It found that on multiple occasions that there is unsustainability here. Judge Miller, I apologize, it looked like you had a question. Oh, I'm sorry. Judge Miller, if you had a question, I didn't mean to cut you off. Oh, I guess I wasn't about to ask it, but I will ask. What about the exclusion of manufacturers? I mean, they do allege, you know, you've got one buyer that did start these direct sales, and the other manufacturers made that a point of their advertising. I mean, so all of which suggests, or one could infer from that, as we have to do at this stage, that there is some practice in the industry that is preventing the others from competing. So why isn't it reasonable to exclude them, at least at this stage? Certainly, Your Honor. And you're right, plaintiffs do exclude manufacturers. But yet, this is where they cite in their complaint conflicting exceptions that would swallow the rule here. In their complaint, they cite that Bayer, a major manufacturer, is an exception to this rule. And they try to navigate around it by saying, despite that, all manufacturers should be excluded. But if we look to the FTC report, which is incorporated by plaintiffs in this case, we submitted and we filed the motion to take judicial notice of it, which the court did below, which you are entitled to take notice of as here, and the plaintiffs did not oppose that. The FTC report, over 114 pages and 450 footnotes, details the competitive nature of this marketplace, the competitive nature of all of the various sales channels, of all of the various elements, top-down manufacturers, vet clinics, wholesale markets, secondary wholesale markets, retailers to the ultimate consumer, the pet owner in this case. And therefore, without plaintiffs having a well-plaid complaint or factual allegations in any way, shape, or form to give you a sense of what this market should look like, you can look to the FTC report to see there's a lot going on here. It's a $10 billion marketplace. And to state that only our client has exclusive control of this marketplace is simply facially unsustainable, and therefore, the court was proper to dismiss it. What is the difference between plausibility and facial unsustainability? I can't... What would it look like to plead a plausible market definition, but one that is nevertheless facially unsustainable? I'm sure perhaps English professors around the country may argue with me in this definition, Your Honor. But plausible, under Tuomly and its progeny, would simply state it's on its face. You can't find it. You're making up speculation. You're going beyond the realm of reality. Where plausible... Where it's facially unsustainable here, which is what we have in this case, where it conflicts with itself. Where in the document itself and in plaintiff's own pleadings, they are conflicting. And we've cited that on numerous occasions. The district court found that on numerous occasions as to how what they argue in their briefs and what they state in their complaint simply cannot and is not true based on the record. You were talking about a conflict between the complaint and an FTC report. I don't... It's just sort of odd. I don't know quite what to do about the FTC report. I mean, a plaintiff has a right to say that the FTC was wrong. The plaintiff has a right to make allegations that are contrary to what the FTC said. I mean, that gets worked out on the merits as opposed to in the pleading stage, I would think. So what role... And I don't even know what it means to say you take judicial notice of an FTC report. I mean, you can take judicial notice that this report exists, but the plaintiffs aren't somehow bound by what the FTC found. No, we certainly agree, Your Honor. Nor is this court. We ask you to take judicial notice of it and consider it in your decision and in your opinion, which is what the district court did here as well. But to my mind, the plaintiffs tried to embrace the FTC report and say, ha, this shows you that this secondary wholesale market is in fact a market in and of itself. But they try to take the good and leave behind the bad. Because if you look at the FTC report, it expressly states the secondary distribution facilitates increased competition between veterinarians and other retailers, resulting in additional purchasing options and potentially lower prices for consumers, particularly for over-the-counter flea and tick products. And that's at page 90 of the FTC report. So while we ask you to take notice of it, we ask you to look at that with respect to what plaintiffs have tried to allege and say it is facially unsustainable to comport what the plaintiffs have pled and what the economic realities are in this marketplace, which is what Brown, Shue, and plaintiffs themselves have argued. If we want to look at economic realities, we can't be an ostrich and stick our head in the sand and pretend that the marketplace isn't what it is. The FTC report gives us a glimpse into the view beyond that. In addition, and I'll move on to market power  But with respect to plaintiffs' definition, let's assume for the moment they are able to plead a relevant market. We'll give them that. Let's assume you take everything as true as we're supposed to. They have not pled and cannot plead market power within the market that they have alleged here. And plaintiff attempts to do it in at least two attempts. They take a public document from my client, a 2018 public document that is referenced, that is cited overtly in their complaint, and try to argue that we therefore have market power. First, they cite to a 90% ratio, that my client purchases 90% of their products from manufacturers in an effort to say that we control 90% of the market. That's just a plain misreading of the document. Just because I buy 90% of my cars from Chevy doesn't mean that Chevy is a monopoly. We're able to purchase from whoever we want, and in fact, as Your Honor has already noted, manufacturers are not part of the marketplace. So how does that give us any reference to what the market power should be? Secondly, they cite to another page in the same document that states we have a 95% share in the prescription drug, in the prescription medicines, to retailers. Again, that is not the market they have pled. Perhaps if they pled only a prescription drug marketplace, then maybe we'd have that case, but that is not this case. Finally, Your Honors, I would point to the judge's opinion at page 11, where even if we plead market power, even if we plead a relevant market, plaintiff here has not and cannot allege that this has been harm to competition. As we know from Brown, Shue, and others, the purpose of the antitrust laws are to protect competition, not competitors. Here we have a competitor, MedVets and Bay Medical, which are suing my client because they lost. Yes, there are winners and losers in competition every day. That is what happens. But that does not mean that there's a monopoly. That does not mean that there's anti-competitive conduct. Where we do have not alleged actual harm to competition, we cannot and should not allow a complaint to proceed forward. Judge Chesney found this at page 11. Please, Judge Millis. You're over your time, so if you want to complete your sentence. Thank you, Your Honor. I will leave it there and turn it over to my co-counsel, Ms. Persigian, who will address the issues related to a pre-complaint discovery. Thank you for the time. Thank you. Thank you. I'm Jennifer Persigian from Winston & Strong for Defendants, and I thank everyone for helping with the technical assistance today. I'll address briefly the plaintiff's failed attempt to try to get discovery before pleading adequately a claim. That ruling by Judge Chesney is subject to an abuse of discretion that would require this court to say something like she made an absolutely clear error of judgment. I'm not going to go through her decision on the motion to dismiss. There's simply nothing like that here. As my colleague said, she got it right. Plaintiffs failed to show good cause to warrant a departure from the federal rules of civil procedure and the orderly course of discovery. They're really asking for an exception to Rules 8 and 12, and they haven't done the work to deserve to kind of jump past those restrictions on discovery. And as Judge Chesney found, there's plenty of facts available. We have, as we discussed, the FTC report, 115 pages of facts with multiple footnotes, dozens of footnotes of public sources that they have not taken advantage of. Judge Chesney also found that plaintiffs failed to include facts about their own business in the complaint. As Mr. Rubin said, they've been in this business for 10 years, but they failed to give any details about their suppliers, their course of history, their being foreclosed from the market, anything of that nature. All of that is absent from the complaint, and so they simply haven't done the work. They told Judge Chesney that they had done interviews of folks in the industry and were unable to find information that was helpful to them. That may simply be because they don't have a claim here. They failed to give a lot of detail about why that information was not sufficient, why they couldn't plead a claim. And it was absolutely reasonable for Judge Chesney to insist on specificity in the complaint that's consistent with Twombly and with this court's ruling in Kendall that talk about the need for specificity in pleading before getting to what, in antitrust cases, is a hugely expensive and time-consuming process of discovery. And there simply aren't any unusual circumstances here that warrant departing from the normal rules of civil procedure. All the cases plaintiffs cite involve merger challenges where there's a preliminary junction at issue, usually by the FTC. And in those situations, sometimes courts have allowed expedited discovery. There's nothing like those unusual circumstances here and nothing like the other sorts of unusual circumstances that exist in cases that they cited where there's ongoing infringement or things of that nature. Plaintiffs persistently argue that if they had this discovery, the outcome here would be different, and so they deserve it for that reason. But that's speculation. There's absolutely no reason to think so. The FTC had all this information, and they declined to challenge this merger more than two years ago. Critically, they let it close. And nothing about the market share or market definition would fix the other issues that exist in this complaint, things like the conclusory allegations of foreclosure, which plaintiffs would be subject to challenge on again by defendants, that those are simply conclusory and don't meet the standards of Twombly, and they haven't shown antitrust injury or antitrust standing because they've really only alleged harm to competitors and not to competition. They don't even claim that prices have gone up, and they seem to be the only one that's harmed, and that is competition. They're winners and losers. It's not an antitrust violation. So Judge Chesney did not abuse her discretion. Thank you, Your Honor. Thank you. Mr. Rubin? Mr. Rubin, I think you're still on mute. Thank you. My apologies. To address briefly what it means to be unsustainable, we take it from the case law that it means that there is no known universe in which the product market defined in the FAC could possibly be true. So it means it's implausible. Really? Even though the United States government's expert competition agency has described this market. It's speculative? Really? In spite of uncontroverted evidence of restricted policies by animal health OEMs which force retailers to purchase from unconventional veterinary credentialed wholesalers. Or a conclusory? Really? In spite of the unique demands of large-scale retailers and the specialized skill needed to supply them? What counsel overlooks is the difference between functional and substitutability and economic substitutability. Not all vets are created equal. And it is no contradiction to say that there are a few vets that have decided to become diverters and many more vets that do not participate in that market. It's not a question of all or nothing for veterinarians. It's a question of whether some of them want to be diverters or not. Now, with respect to the 95% share, 95% is the number that defendants use to describe their coverage of their share of prescription medications going to retailers. What are those? Those are precisely the drugs that flow through the secondary distribution channel. Those are precisely the products that my client and the other diverters who are no longer in business because they have no access and no ability to get to the market and sell to these retailers have been dealing with as well. So we would ask the... And finally, just with respect to the expedited discovery motion, we would not need this discovery if the court were to apply the standards for pleading that exist in the law. Instead, the court asked us for specifications that we will discover on discovery but cannot know without some kind of discovery and the purpose of our motion was simply to respond to the demands made by the district court. It is not necessarily on the face of the FAC to have the information because we believe the FAC's market definition and allegations of market power are plausible and sustainable and should not be dismissed on a Rule 12B6 motion. Thank you. Thank you, counsel. We thank all three counsel for your very helpful arguments this morning and the case is submitted. Thank you, Your Honors.
judges: Miller, Hunsaker, Schiltz